IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                                    No. 13-CR-3897-MV-1

DAVID SAVOY THOMAS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on two of Defendant David Savoy Thomas's motions pending in this case: first, to dismiss Counts I & II of the Indictment [Doc. 26] and, in the alternative, to sever Count I of the Indictment [Doc. 25]. The Court, having considered the motions, briefs, relevant law, and being otherwise fully informed, finds that both of the motions are not well-taken and therefore will be **denied**.

## BACKGROUND

Defendant David Savoy Thomas is charged in a five count Indictment with four counts of Hobbs Act robbery and one count of employing a firearm during the commission of a crime of violence. Doc. 28 at 1. Each of these charges arises out of a series of robberies committed at businesses located near the corner of Lomas Boulevard NE and San Pedro Drive NE in Albuquerque, New Mexico.

The first incident occurred on May 1, 2010. A man, allegedly Thomas, entered a McDonald's store, pushed an employee "away from the register" and took "$60 from the till."

1

*Id.*, at 2.  Sometime after the robbery, Albuquerque Police Department detectives investigating the incident viewed video captured by the McDonald's surveillance cameras, but never sought to "preserve or collect the video recording."  Doc. 26 ¶ 2.  Consequently, the video was likely erased years ago; Thomas represents that an investigator with the Federal Public Defender is attempting to locate an archived copy, but it is unlikely that one will be found.  *Id.* ¶ 3.

Three years after the McDonald's robbery, a man matching Thomas's description committed three robberies at two stores located in a shopping center across the street from the McDonald's at Lomas and San Pedro.

On August 10, 2013, a man armed with a knife robbed the clerk on duty at the Family Dollar store in the shopping center, taking $120 before fleeing the scene.  Doc. 28 at 2.  The clerk described the man as a "light-complected black man with freckles."  *Id*.  Detectives from the Albuquerque Police Department were unable, despite apparent attempts, to secure a useable copy of the video from the Family Dollar's security camera; a detective even "tried to record the video from the video screen at the Family Dollar Store using the camera in his phone, but the video was already of such poor quality that the phone recorded copy was useless."  *Id.*, at 3.  Defense investigators have since learned that, as with the McDonald's video, this footage likely no longer exists.  Doc. 26 ¶ 6.

Six days later, on August 16, 2013, a man wearing a wig, but otherwise matching the same description, attempted to rob the same Family Dollar; he approached the clerk with a knife, pulled the clerk onto the counter by her shirt, and, after a struggle, fled without completing the robbery.  Doc. 28 at 2.  The Albuquerque Police Department later presented the clerk, Amy Lynn, with a photo array containing six images, from which she identified Thomas as the robber.  *Id*.  Neither party mentions whether video of this incident exists.

On October 19, 2013, a man *again* matching the same description entered the Check 'n Go located in the same shopping center as the Family Dollar, allegedly brandished a handgun and threatened to kill the clerk. *Id.*, at 3. After waiting for the clerk to open the time-locked safe, the man left the store with $3,723 in cash. *Id.* The clerk, Erica Lucero, later identified the robber as the same man who robbed the Family Dollar, evidently recognizing him from photos of the Family Dollar suspect posted around the shopping center. *See* Doc. 27 ¶ 5; Doc. 28 at 3. The FBI successfully obtained recordings from the Check 'n Go's security cameras. Doc. 28 at 3.

## DISCUSSION

As a threshold matter, given the decidedly local nature of these crimes, the Court is compelled to evaluate whether or not the jurisdiction of the federal courts may stretch this far, even though this issue has not been raised by the parties. *See 1mage Software, Inc. v. Reynolds and Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) ("[f]ederal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,' and thus a court may *sua sponte* raise the question of whether there is subject matter jurisdiction 'at any stage in the litigation.'") (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)). *See also Campos v. Las Cruces Nursing Ctr.*, 828 F. Supp. 2d 1256, 1265 (D.N.M. 2011) (Browning, J.) ("The Court is responsible for ensuring, even *sua sponte*, that it has subject-matter jurisdiction before considering a case."). Under the prevailing interpretation of the Hobbs Act, even the relatively modest monetary sums at issue here establish a sufficient connection to interstate commerce under the "depletion theory" to qualify these robberies for federal prosecution. *See, e.g.*, *United States. v. Rutland*, 705 F.3d 1238, 1245 (10th Cir. 2013) (explaining that jurisdiction "is usually a simple inquiry since most Hobbs Act cases

involve the robbery of a business, and businesses usually are either engaged directly in interstate commerce or purchase or sell goods shipped in interstate commerce"); *United States v. Curtis*, 344 F.3d 1057, 1070 (10th Cir. 2003) ("proving that a robbery depleted the assets of a business engaged in interstate commerce will suffice.").

## I. Motion to Dismiss Counts I & II of the Indictment

Consistent with a defendant's right of access to evidence under *Brady v. Maryland* and its progeny, the Due Process Clauses of the Fifth and Fourteenth Amendments impose a duty on law enforcement entities to preserve evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). To qualify for preservation under *Trombetta*, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*., at 489. *See also United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010) (describing the two-pronged analysis set forth in *Trombetta*).

However, where the evidence at issue is merely *potentially* exculpatory, the Supreme Court has imposed the additional requirement that a defendant demonstrate "bad faith on the part of the police" in order to establish "a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). That is, when "no more can be said [of the evidence] than that it could have been subjected to tests, the results of which might have exonerated the defendant" a showing of bad faith in the government's failure to preserve the evidence is required. *Id.*, at 57. *See also United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994) (explaining that "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was

4

'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence").

Predictably, the parties dispute whether *Trombetta* or *Youngblood* controls. However, irrespective of which standard obtains, Thomas's motion to dismiss must be denied. As raised by the government in its opposition, both *Trombetta* and *Youngblood* address the failure of law enforcement officials to preserve evidence *under their control*, such that neither is apposite here. Doc. 28 at 5-6. Indeed, research has not revealed any case in which a court held that the government owed a duty to preserve evidence that it had never possessed. The Tenth Circuit reached this same conclusion in *United States v. Hartman*, stating, "[e]ven had the video had exculpatory value, it is not clear under the precedents cited that the government has any duty to preserve evidence not in its control." 194 F. App'x 537, 542 (10th Cir. 2006). *See also Champ v. Zavaras*, 431 F. App'x 641, 648 (10th Cir. 2011) (noting, in affirming the denial of a *habeas* petition, that petitioner had not cited "any case law demonstrating that the government can be held to violate due process by failing to preserve evidence that it never possessed or necessarily had access to").

Rather, it is a tacit assumption of the jurisprudence in this area that, at some point, the government controlled or possessed the evidence in question. *See, e.g.*, *Magraw v. Roden*, 743 F.3d 1, 7 (1st Cir. 2014) ("A pair of Supreme Court decisions speak to the dimensions of a defendant's rights when requested evidence, *formerly in the government's possession*, is lost, destroyed, or otherwise unavailable.") (emphasis added); *United States. v. Malone*, No. 90-50538, 1991 WL 230191, at *4 (9th Cir. Nov. 8, 1991) ("The consequence of the government's destruction of potentially exculpatory evidence *in its custody* is controlled by *California v. Trombetta.*") (emphasis added); *United States v. McClure*, No. 90-5001, 1990 WL 180122, at *3

(4th Cir. Nov. 21, 1990) (affirming a district court ruling that evidence was not *Brady* material in part because "the government did not possess the tape" and noting that merely "reviewing the evidence had not amounted to taking possession" of it). *See also* Fed. R. Crim. P. 16 (requiring disclosure of items "within the government's possession, custody, or control…").

This reading comports with an understanding of *Trombetta* and *Youngblood* as the logical and prophylactic extensions of *Brady* and its progeny. That is, because *Brady* provides for "a due process right to review all evidence in the government's possession that is material to [] guilt or punishment," *Trombetta* and *Youngblood* may be understood as ensuring that this right is safeguarded by demanding that the government preserve particular categories of evidence in its possession. *Magraw*, 743 F.3d at 7. Framed in this manner, *Trombetta* and *Youngblood* are best read as regulating government conduct only with respect to the evidence it possesses; precedent does not require that the government serve as investigator for the defendant. *Cf. Youngblood*, 488 at 59 ("the police do not have a constitutional duty to perform any particular tests.").

Moreover, to the extent that the government technically possessed a disk "purporting to have the [Family Dollar] surveillance videos on it," the contents of the disk were of such low quality that they either do not constitute evidence or were not obviously exculpatory. *See, e.g.*, *United States v. Revolorio-Ramo*, 468 F. 3d 771, 775 (11th Cir. 2006) (where the "vast majority of the images were unusable" no bad faith could be shown in their destruction); *Mora v. McDonald*, No. EDCV 11–323–CJC (MAN), 2012 WL 6878888, at *9 (C.D. Cal. Oct. 10, 2012) (no violation of due process where audiotapes were "unusable due to human error" because of chronically malfunctioning police equipment); *Shattuck v. Workman*, No. 07–CV–378–JHP–PJC, 2010 WL 4917252, at *4 (N.D. Okla. Nov. 24, 2010) (rejecting a *habeas* petition in part

because of petitioner's failure to demonstrate that exculpatory evidence "ever existed" where an audio recording was unusable).

Thomas offers nothing more than a bare assertion that he did not commit the crime to dispute this conclusion.  Doc. 26 ¶¶ 7, 9, 12.  Other courts confronted with similar facts have declined to find that such self-serving statements are sufficient to hold that evidence is exculpatory under *Trombetta*.  *See, e.g.*, *Scarborough v. Crosby*, No. 8:02CV476-T-30TBM, 2005 WL 1051096, at *8 (M.D. Fla. Mar. 31, 2005) ("Other than his self-serving assertion, Scarborough did not allege or proffer to the state trial court objective evidence showing that the clothing was exculpatory evidence.").  Consequently, even if the government once "possessed" the evidence, the more stringent *Youngblood* standard would apply, and, given the absence of any indication of bad faith, Thomas's motion would still be denied.

## II. Motion to Sever Count I of the Indictment

Federal Rule of Criminal Procedure 8(a) provides that offenses may be joined where they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  The Tenth Circuit has urged that "Court[s] should construe 'Rule 8 . . . broadly to allow liberal joinder to enhance the efficiency of the judicial system.'" *United States v. Bagby*, 696 F.3d 1074, 1086 (10th Cir. 2012) (omissions original) (quoting *United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001)).

In order to provide relief for defendants in instances where broad joinder of claims would risk undue prejudice, Rule 14 provides that "the court may order separate trial of counts … or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).  *See also United States v.*

*Olsen*, 519 F.3d 1096, 1102 (10th Cir. 2008) ("Even if the requirements of Rule 8(a) are met, however, Federal Rule of Criminal Procedure 14(a) permits a trial court to conduct separate trials if the joinder of separate offenses appears to prejudice a defendant or the government.") (internal quotation marks omitted). However, the "defendant bears a heavy burden of showing real prejudice from the joinder of the [] counts." *United States v. Maxwell,* 492 F. App'x 860, 865 (10th Cir. 2012) (quoting *United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993)). *See also United States v. Hutchinson*, 573 F.3d 1011, 1025 (10th Cir. 2009) (explaining that the defendant must show that the "prejudice would 'outweigh' the expense and inconvenience of separate trials."). The court in Maxwell explained that:

> a defendant fails to meet his burden where: (1) '[t]he two counts were separate and distinct, and the evidence presented at trial was not too confusing or unfairly overlapping"; (2) "[t]he offenses took place on different dates at different locations, and different witnesses and evidence were presented on each count"; and (3) "the case for each count was strong enough on its own."

*Maxwell*, 492 F. App'x at 866 (quoting *Muniz*, 1 F.3d at 1023). Ultimately, the decision to sever "rests within the discretion of the district court." *Olsen*, 519 F.3d at 1102 (quoting *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997)).

The practical effect of Rules 8 and 14 is to create a regime that countenances the broad joinder of offenses, but which moderates the deleterious effects of this joinder through the exercise of discretionary severance. *See, e.g.*, *Williams v. United States*, 416 F.2d 1064, 1069 (8th Cir. 1969) ("Rule 8(b) need not be construed with undue strictness as Rule 14 provides an adequate means to protect individual defendants from a prejudicial joint trial."). That is, Rule 14 provides a safety valve for the highly technical and inclusive analysis under Rule 8. *See United States v. Lane*, 474 U.S. 438, 449 n.12 (1986) ("the Rule 14 prejudice component involves a different inquiry from the Rule 8 technical requirements.").

8

Other than the Defendant's perfunctory argument to the contrary (Doc. 25 at 3-4), there does not appear to be a basis to hold that the four Hobbs Act robbery counts are not "of the same or similar character." Each incident allegedly involved the Defendant entering a store and then immediately seeking to extract money from the register by force or threat directed at an employee. Further, each of the robberies was committed at a store at the same intersection in Albuquerque; indeed, Counts II & III involve the same Family Dollar. Plainly, these crimes are sufficiently similar in character to qualify for joinder under Rule 8(a). *See United States v. Acker*, 52 F.3d 509, 513 (4th Cir. 1995) (holding that robberies were properly joined where "defendant's actions were essentially the same in each robbery," and "her entire *modus operandi* clearly qualifies" as similar).

While the McDonald's robbery occurred on May 1, 2010, the timing of the alleged offense does not carry much weight in "same or similar" analysis under Rule 8(a). *See United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994) (explaining that "the similarity of character of different offenses does not significantly depend on their separation in time" and that "if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned"). Moreover, it appears that the "temporal connection" language in *Bagby* upon which Thomas relies actually refers to the propriety of joining narcotics and weapons charges as part of the same criminal activity or venture; that is, although the language in *Bagby* is admittedly imprecise, it seems to deal with the "same act or transaction" or "common scheme or plan" criteria rather than the "same or similar character" language in Rule 8(a). *See* Doc. 25 at 3; *Bagby*, 696 F.3d at 1086. Thus, Count I is properly joined under Rule 8(a).

The issue of severance under Rule 14(a) presents a closer question. The government is correct that "simply because 'the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14'" and that such an argument is now unavailable in the Tenth Circuit. Doc. 29 at 6 (quoting *Olsen*, 519 F.3d at 1103) (in turn quoting *United States v. Wiseman*, 172 F.3d 1196, 1212 (10th Cir. 1999)). However, courts have also recognized that the "likelihood of prejudice is greater when offenses of a same or similar character have been joined for trial because 'proof of one crime may tend to corroborate the commission of the other crime in violation of the evidentiary rules against evidence of a general criminal disposition or propensity to commit crime.'" *Maxwell*, 492 F. App'x at 865 (quoting *Muniz*, 1 F.3d at 1023)).

Ultimately, however, the facts of this case likely do not counsel severance; Thomas has not articulated any substantial concerns beyond the *de rigueur* objections to joinder in general. Doc. 25 ¶¶ 6-7. The offense underlying Count I "took place on [a] different date[] at [a] different location[], and different witnesses and evidence [will be] presented," which reduces the risk of confusing the jury and diminishes the potential prejudice associated with trying the entire Indictment together. *Muniz*, 1 F.3d at 1023. *See also* Doc. 25 at 3. Thomas has not met the heavy burden of demonstrating that he faces actual prejudice; absent more particular concerns, whatever generalized prejudice may arise from charging Count I with Counts II-V may be mitigated by issuing limiting instructions to the jury and is outweighed by the added cost and inconvenience of holding a separate trial. *See United States v. Hutchison*, 573 F.3d 1011, 1026 (10th Cir. 2009) ("limiting instructions are ordinarily sufficient to cure potential prejudice.") (internal quotation marks omitted).

## CONCLUSION

Thomas has demonstrated neither that the police destroyed materially exculpatory evidence in their possession, nor that he would be prejudiced by the joinder of Count I to the rest of the Indictment.

**IT IS THEREFORE ORDERED** that both of the Defendant's motions are denied.

Dated this 21st day of November, 2014.

_____
**MARTHA VAZQUEZ**
UNITED STATES DISTRICT JUDGE