IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 13-CR-3897-MV |
| DAVID SAVOY THOMAS. | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Tainted Identifications [Doc. 27], the Government's First and Second Motion[s] *in Limine* and Request for a *Daubert* Hearing [Docs. 34, 35], and the Government's Motion[s] *in Limine* as to Character Evidence and Other Acts Evidence [Docs. 38, 39]. Having considered the Motions, briefs, relevant law, and being otherwise fully-informed, the Court now disposes of these motions as described below.

**BACKGROUND**

This Court has already given an ample factual recitation in this case; in the interest of brevity, the Court will assume familiarity with the procedural history of this matter and with the Court's previous orders. The Court will address each of the pending motions in turn.

**DISCUSSION**

**I.   Defendant's Motion to Suppress Tainted Identifications [Doc. 27]**

Stated succinctly, Thomas argues that the photo array procedure by which he was identified is constitutionally deficient. To prevail in this argument, Thomas must succeed in

1

demonstrating both that "the photo array was unduly suggestive" and, if it was, that "the identifications were [not] still reliable in view of the totality of the circumstances." *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014). In analyzing whether an array was unduly suggestive, the Court "may consider several factors," none of which is dispositive, "including 'the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *United States v. Smith*, 156 F.3d 1046, 1050 (10th Cir. 1998) (quoting *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)).

      a. *Suggestive Identifications*

Here, Defendant argues that five primary factors contribute to the conclusion that the array shown to the two eyewitnesses was impermissibly suggestive: (1) the array contains only six photos; (2) the selection of the alternative photos and placement Thomas's photo in the top-left corner influenced witnesses; (3) the process by which witnesses were shown the photos biased the witnesses; (4) at least one witness had seen a photo of Thomas prior to viewing the photo array; and (5) cross-racial identification is particularly unreliable. *See* Doc. 93 ¶¶ 4-6; Doc. 27 ¶¶ 2-3. First, while "the number of photographs in an array" is generally not regarded as a "substantive factor, but instead is a factor that merely affects the weight given to other alleged problems," the Tenth Circuit has warned that small arrays "weigh heavily in the balance of factors to be considered." *Sanchez*, 24 F.3d at 1262-63 (10th Cir. 1994). The Court will bear this edict in mind as it considers the remaining concerns that Thomas has raised.

Second, the Court agrees that Thomas appears to have been the man with the lightest skin in the array and certainly the only one with freckles. This imperfect selection may be a result of the somewhat narrow pool from which the Albuquerque Police Department draws its photos, but, conversely, it may merely indicate that Thomas has a less-common, and therefore more readily-

2

identifiable physical appearance. Even so, the Court accepts that the selection of photos and the placement of Thomas's photo in the "first" slot may have been suggestive to the eyewitnesses.

Third, Thomas argues that the use of a simultaneous photo array, and the presentation of the array by the detective who prepared the array further contributed to the infirmity of the identification procedure. Doc. 27 ¶ 2. Here, Thomas is contradicted, at least in part, by the testimony of his own expert, discussed below, who stated that simultaneous presentation of photos is preferable to sequential, and, in fact, that "the simultaneous format is the best we know just now." Doc. 91 at 126. While there appears to be some disagreement as to the manner in which Amy Lynn was shown the photos, the Court finds, based on the photo array and accompanying form that Lynn signed and detective Church's testimony regarding the procedure he used, that both eyewitness were presented the photos in the preferable, simultaneous format. *Compare* Doc. 91 at 35, 45 *with id.* at 52. Moreover, it is apparent from the audio recordings of the encounters that each witness was warned extensively about the importance of only selecting a person from the array if she was certain that the photo matched her assailant and that she was under no obligation to choose anyone at all. *See, e.g.*, Gov't Exs. 7-8; Doc. 91 at 55, 78.

Fourth, while Thomas argues in his Motion that one of the eyewitnesses, Erica Lucero, saw a photo of Thomas that indicated he was a suspect in the robbery of the Family Dollar store in the shopping center, Lucero flatly denied this contention during her testimony at the hearing. *Compare* Doc. 27 ¶ 5 *with* Doc. 91 at 73-74. Without any evidence presented to the contrary, the Court accepts Lucero's testimony and finds that Lucero was not "prompted" to identify Thomas as the robber by another photograph in the shopping center.

Fifth, the Court accepts that cross-racial identification may be less reliable than intra-racial identification, but, properly, this complaint registers as a criticism of the *reliability* of the

identification, rather than its *suggestiveness*; consequently, it will be discussed in the section below.  In aggregate, there is some indication that the procedure employed by detective Church in his investigation implied that the eyewitnesses should select Thomas's image as connected to the robberies; a photo array illustrating one freckled man in the first slot out of only six alternatives certainly appears to suggest its desired result.  However, even if the Court were to conclude that this procedure was impermissibly suggestive, because it was nonetheless reliable, the Court would still decline to suppress the identifications.

      b. *Reliability of Identification Procedures*

In its analysis of reliability, the Court asks whether, despite any potential infirmity, the identification "is sufficiently reliable to satisfy due process."  *Kamahele*, 748 F.3d at 1020.  "For reliability, the pertinent factors include:  (1) the opportunity of the witness to view the suspect during the crime, (2) the witness's level of attention during the crime, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty the witness demonstrated during the array, and (5) the time lapse between the crime and the array."  *Id.* at 1020-21 (rearticulating factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  This reliability "must be weighed against the corruptive effect of a suggestive pre-trial identification procedure to determine whether the identification testimony should have been suppressed."  *Smith*, 156 F.3d at 1051 (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993)).  If these factors indicate that there remains "a very substantial likelihood of irreparable misidentification" then the identification violates due process.  *Grubbs*, 982 F.2d at 1490 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1972)).  Given the considerably different circumstances in the two robberies, the Court will analyze each separately.

Amy Lynn saw the suspect during a very brief encounter that lasted only a matter of moments. As is apparent from the surveillance video shown during the hearing held on this matter, the suspect entered the Family Dollar store, attacked Lynn, and left almost immediately thereafter. However, Lynn explained that she had been focused on the suspect even before he entered the store, in part because of the wig that he was wearing, which led her to ask herself "is that a tranny coming in?" Doc. 91 at 49. Whatever Lynn's thoughts about the suspect, it is apparent from her uncontested testimony not only that she was aware of the man before he robbed the store, but also that she found him sufficiently unusual to maintain her attention as he approached the door. *See id* at 48-49. Moreover, Lynn remembered the robber well enough to provide Detective Church with an accurate description and selected Thomas from the array; although he wore a crude disguise, Lynn stated that she was still able to see the assailant's face. *See id.* at 54-55. Additionally, both during the photo array identification and at the hearing, Lynn explained that she was completely certain that Thomas was the man who robbed the Family Dollar store. *See, e.g.*, *id.* at 52. Even Thomas's own expert, Professor Malpass, explained that there is a significant correlation between expressed certainty and accuracy of identification, although this factor is not, on its own, determinative. *Id.* at 138-39. Finally, Lynn identified Thomas on October 28, 2013, approximately two months after the August 16, 2013 incident; the Tenth Circuit has held that such a short interceding period does not make an identification unreliable. *Kamahele*, 748 F.3d at 1021 (three months between an incident and identification deemed acceptable).

While Thomas suggests that, among other factors, the slightly different accounts of the identification procedure offered by Detective Church and Lynn indicate that "her identification is unreliable under the totality of the circumstances," this complaint cannot withstand any serious

5

scrutiny. Lynn's testimony on January 22, 2015, more than sixteen months after she identified the suspect, logically bears no relation to how well she remembered the events of August 16, 2013 on October 28, 2013. Doc. 93 ¶ 9. Thus, on the Court's evaluation, only the first factor can arguably be met in this case; even cognizant of the warnings presented by Professor Malpass, the Court is persuaded that, on balance, Lynn's identification of Thomas was reliable when weighed against any impermissible suggestion in the procedure used to obtain it.

Erica Lucero had significantly longer to observe her assailant; she stood across the counter from him for at least ten minutes while he waited for the time-lock on the safe to disengage. *See* Doc. 91 at 64-65. Lucero testified that she "looked at him the whole time he was there" and that although she looked briefly at the gun he pointed at her, she focused primarily on his face. *See id. See also id* at 75. Further, like Lynn, Lucero both stated that she was completely certain of her identification and provided police with an accurate description of the robber. *See, e.g.*, *id.* at 72. Finally, Lucero met with Detective Church and identified Thomas from the array a mere nine days after the incident. This identification is plainly reliable under the factors articulated by the court of appeals, notwithstanding any minor deficiencies that may exist in the administration of the photo array. Consequently, neither identification will be suppressed.

Finally, the Defendant urges that, "[i]n no event should either Ms. Lynn or Ms. Lucero be allowed to make an in court identification of Mr. Thomas at trial" because "they were peeking through the windows into the courtroom before the suppression hearing to get a look at Mr. Thomas." Doc. 93 ¶ 11. However, Thomas cites to no authority for this broad proposition. Moreover, Thomas remained in the courtroom during each eyewitness's testimony at the hearing, such that, irrespective of whether either witness "peeked" or not, she would have seen Thomas in

his orange jumpsuit nonetheless. Further, at trial, as at the suppression hearing, Thomas will be one of the few people "sitting at counsel table" with defense counsel. Hence, it is not entirely clear what the source of Thomas's objection is. While the Court has little patience for the unnecessary and stale theatrics of courtroom identifications, unless Thomas can persuade the Court with legal authority to prohibit the government from eliciting such testimony, the objection will be overruled.

## II. The Government's First Motion *in Limine* [Doc. 34]

This motion has a storied history unto itself that the Court will not relate yet again. The government preemptively requested that the Court exclude testimony from any proposed expert witness on the issue of whether eyewitness identifications, particularly cross-racial identifications, are reliable. *See* Doc. 34 at 1. Having heard Professor Malpass's testimony during the *Daubert* hearing on January 22, 2015 and having considered this testimony in its resolution of Defendant's Motion to Suppress [Doc. 27], the Court determines that Thomas may elicit narrow, general testimony on certain issues from Professor Malpass at trial.

The Court's consideration of potential expert testimony is governed by the framework articulated in "a trilogy of Supreme Court cases [*Daubert*, *Kumho Tire Co.*, and *Joiner*]" that "clarify the district court's gatekeeper role under Federal Rule of Evidence 702." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). In order to discharge its obligation under Rule 702, "a district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Id. See also* Fed. R. Evid. 702. The "the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury" rests squarely with

the proponent of the testimony. *Vondrak v. City of Las Cruces*, 671 F. Supp. 2d 1239, 1244 (D.N.M. 2009). Further, where, as here, "a party objects to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has taken these gate-keeping responsibilities seriously" including by providing sufficient record for appeal and replying "in some meaningful way to the *Daubert* concerns the objector has raised." *StorageCraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1190 (10th Cir. 2014). Even so, the district court is invested with a significant degree of discretion in determining whether to admit or exclude expert testimony. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004) ("We review for abuse of discretion the manner in which the district court exercises its *Daubert* 'gatekeeping' role in making decisions whether to admit or exclude testimony.").

With respect to reliability, the Supreme Court has "articulated a non-exclusive list of factors which weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community." *Vondrak*, 671 F. Supp. 2d at 1243 (citing *Daubert*). "Courts both before and after *Daubert* have [also] found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact" these factors include "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," whether the testimony will "unjustifiably extrapolate[] from an accepted premise to an unfounded conclusion," whether the testimony "has adequately accounted for obvious alternative explanations," whether "the expert

is being as careful as he would be in his regular professional work outside his paid litigation consulting," and whether "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Advisory Committee Notes to 2000 Amendments to Rule 702* (internal quotation marks and citations omitted).

The "relevance" inquiry is a more complex evaluation that asks, among other things, "(1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility." *Rodriguez-Felix*, 450 F.3d at 1123. *See also United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) ("To determine whether the testimony will assist the trier of fact, courts look to whether the testimony is relevant, within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness's credibility.") (internal quotation marks omitted). Stated differently, the Tenth Circuit has explained that the ultimate "touchstone of admissibility" is whether the jury is "capable of resolving the issues in this case without expert testimony." *N. American Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1112 (10th Cir. 2009).

Helpfully, the Tenth Circuit reaffirmed in *Rodriguez-Felix* that "there has been a trend in recent years to allow [testimony regarding eyewitness identification] under circumstances described as 'narrow.'" *Rodriguez-Felix*, 450 F.3d at 1124 (quoting *United States v. Smith*, 156 F.3d 1046, 1052-53) (10th Cir. 1998)). The panel continued that "the particular facts of a case drive the analysis" but that certain appropriate areas include the issues associated with "cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as the feedback factor and unconscious transference." *Id*. (alteration original) (internal quotation marks omitted). Even so, the court cautioned that

"properly conceived expert testimony may be admissible to challenge or support eyewitness evidence" but should be "subject to the trial court's careful supervision." *Id*. (internal quotation marks omitted). *See also United States v. Henderson*, 564 F. App'x 352, 365 n.13 (10th Cir. 2014) ("One of the hallmarks of expert testimony is its usefulness in dispelling commonly held misperceptions through the use of scientific or other specialized knowledge. For instance, one might look to the debate about experts who opine on the reliability of eyewitness testimony.").

In light of the Court's ruling above on the suppression motion and the Defendant's avowedly limited purpose of "supply[ing] jurors with information" to aid in their own assessment of the facts, the Court will only address the government's objections to those avenues of inquiry that have not already been foreclosed. This excludes the government's specific requests to prohibit testimony regarding blind administration of photo arrays and post-event feedback. Given the Court's prior determinations, it is no longer in dispute that the eyewitnesses identified Thomas according to a constitutionally-adequate procedure, such that the only remaining question is whether the eyewitnesses correctly recollected the person they identified at the time that they selected his photo. These two excluded issues are entirely irrelevant to this question. Moreover, Thomas's own expert has already acknowledged that there is no suggestion that post-event feedback influenced the array identifications in this case. *See, e.g.*, Doc. 91 at 136. The Court will address the remaining concerns raised by the government in turn.

    a. *Correlation Between Confidence and Accuracy*

Professor Malpass writes in his report that "witness confidence in the accuracy of their identification and its' [sic] actual accuracy shows very clearly that this relationship cannot be validly interpreted as revealing whether the witness was accurate or inaccurate in their identification" and that "the overall correlation between confidence and accuracy across many

studied and many conditions does not consistently reach" the level where it would be considered a predictive factor. Doc. 74-1 at 7-8. The government notes that at the hearing, Professor Malpass testified that confidence and accuracy have a correlation of approximately r=.7 and that this is "moderately high" as far "as correlations go." Doc. 91 at 139. These statements are not contradictory. As Professor Malpass explained in his testimony at the hearing, the question of whether confidence "reveal[s] actual accuracy" is, in part, a judgment contingent on how many false positives are deemed acceptable. *See id.* at 138-39. Thus, while the Court would caution to the Defense to restrict Professor Malpass's testimony to objective, scientific matters, rather than normative value judgments, Professor Malpass may testify regarding the strength of the correlation between confidence and accuracy.

This conclusion follows from an evaluation of the *Daubert* factors. At the hearing and in his report, Professor Malpass explained, for example, that he and other scientists in his field are subject to rigorous peer-review, participate in standard-setting professional organizations, and have repeated experiments in numerous different settings to determine the general correlation between confidence and accuracy. *See, e.g.*, *id.* at 99-101. The government may contend that the recent methodological shift away from diagnosticity has undermined these data, but there is nothing in the transcript to suggest that this shift, however significant, indicates that all prior studies are irredeemable. It merely shows that, going forward, the scientists have elected to use what they believe is a more precise analytical tool when conducting their research.

Of course, nothing about the Court's decision to permit testimony regarding the statistical connection between confidence and accuracy in identification prohibits the government from cross-examining Professor Malpass zealously regarding the data on which he relies, the move

away from diagnosticity, and any other element of his testimony.  Indeed, such disputes form the core of effective and trenchant cross-examination.

        b.   *The Effect on Memory Formation of Stress and Weapons*

The same *Daubert* criteria apply with equal force to the Court's analysis of the remaining two objections.  The government argues that the "Court should not allow Dr. Malpass to opine that stress impedes memory when the majority of studies in the metastudy found no such effect" and because "there is no evidence as to whether the witnesses in this case are the type of witnesses whose memories are impeded or the type of witnsses [sic] who memories are improved by stress."  Doc. 94 at 5-6.  In his testimony, Professor Malpass contended that, in light of the "most recent meta-analysis by Fawcett and his group" he believes, based on the data, that the presence of a weapon has a "moderate effect" on memory formation.  Doc. 91 at 143.  Similarly, while he would not speculate as to how the eyewitnesses in this case might be influenced by stress, he acknowledged that stress can have different effects on memory formation in different individuals.  *See id.* at 144-45.  The Court will not prohibit testimony regarding the presence of weapons merely because laboratory conditions are not identical to the "real-world" or because some data contradict his opinion.  An expert's opinion need not be staked on unassailable ground and the government is free to challenge the Professor vigorously on cross-examination.  Stated differently, while the Professor cannot say with any certainty what effect the presence of a weapon had in the instant case, the Court believes that it will be helpful to the jury, in evaluating the testimony of the eyewitnesses, to be informed of what the data suggest.

c. *Cross-racial Identification*

With respect to the issue of cross-racial identification, the government contends that the "Court should not allow Dr. Malpass to testify that a cross-race identification is less accurate than a same-race identification when the laboratory expirements [sic] and the short exposure times do not match the facts of this case." Doc. 94 at 7. Again, the government's objection appears to be that it disagrees that the data on which Professor Malpass rely have much relevance in the real world. And again, the Court notes that while this may be a fair avenue of critique on cross-examination, it is not a genuine attack on the validity of the methodology underlying the opinion or the acceptance of the science within the applicable professional community. Professor Malpass may testify as to the relative accuracy of cross-racial identification as a general matter.

Finally, with respect to each of these three subjects, the Court is not persuaded that an expert in eyewitness identification usurps the jury's role in assessing the credibility of witnesses: so long as the expert cabins his testimony to a general explanation of the issues associated with cross-racial identification and features of perception and memory, then the witness does not tell the jury whom to believe, but rather explains a fact about the human condition that might influence their recollection of events, irrespective of whether the eyewitness is being truthful about what she remembers. On this view, the fact that the science of eyewitness identification and memory formation is less precise or more contested than might otherwise be desired is not particularly problematic; the goal is not to instruct the jury as to how much it should discount a given witness's testimony or which witness to believe most, but rather to provide them with some general, demonstrable, propositions about eyewitness identification in an effort to enable them better to evaluate the testimony themselves.

The Court hastens to add that this testimony must be limited to a brief, general explanation of these three issues associated with eyewitness identification. Defendant is strictly prohibited from eliciting discussion of the identification procedures or particular eyewitnesses in this case and any attempt at insinuation, including the artful crafting of hypotheticals, will be stricken from the record and sanctioned. The Court, in the interest of broadly permitting expert testimony, will allow Professor Malpass to share some of his expertise with the jury in order to help them interpret the testimony of the eyewitnesses in this case.

### III. The Government's Second Motion *in Limine* [Doc. 35]

The Government moves to prohibit Thomas from calling a witness to testify about whether the object Thomas is seen holding in a surveillance video can be determined to be a firearm. *See* Doc. 35 at 1. As Thomas notes in response, this testimony is only relevant because the government does not have in its possession the firearm allegedly used in the commission of the robbery. *See* Doc. 42 ¶¶ 2-4. Thus, the sole sources of evidence that the government can present to prove its case regarding Count 5 of the indictment are the testimony of the Erica Lucero and the surveillance footage of the event. The question, then, is whether under these circumstances, a firearms expert should be permitted to testify that, based on his viewing of the video, he cannot determine whether the object in Thomas's hand is a "firearm."

In essence, the government argues that because this proposed testimony would be based on practical experience rather than "scientific or technical" knowledge, O'Kelly, the substitute proposed expert, cannot qualify under *Daubert* and its progeny. This argument ignores experts qualified by virtue of their "skill, experience, [or] training" rather than by scientific knowledge or education. *See* Fed. R. Evid. 702. The Tenth Circuit has plainly rejected this argument. *See, e.g.*, *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (noting that *Daubert* should

14

not "be applied woodenly in all circumstances" and "recognizing that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade").  This proposed testimony is of a piece with the testimony of police officers or federal agents who testify, based on their training and experience, about criminal slang or the structure of drug transactions:  there is no rigorous methodology or falsifiable hypothesis at work; rather, expertise is acquired through years of contact with the relevant subject and, perhaps, practical training.  Under this view, the Court finds that the proposed expert's opinions are reliable, given his credentials, experience, and background, and that his opinions in this matter would likely be helpful to the jurors in evaluating whether they can be reasonably certain that the object in the video is a firearm.  While visual perception is certainly within the ken of average jurors, distinguishing between genuine firearms and replicas, toys, or other objects, is not.

To the extent that the government argues that the proposed expert should be excluded because the testimony may embrace an "ultimate issue" in this case, this argument is foreclosed by Federal Rule of Evidence 704.  *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").  The Defendant will be permitted to present its firearms expert.

IV.     **The Government's Third Motion** *in Limine* **[Doc. 38]**

In this motion, unlike its two predecessors, the government seeks to prevent potentially damaging cross-examination of one of its eyewitness, Erica Lucero.  The core of this motion is easily understood:  Check 'n Go management accused Lucero of embezzling by making loans to friends and family without sufficient verification.  *See* Doc. 38 at 3; Doc.55 ¶¶ 1-3.  Federal Rule of Evidence 608(b) provides that while "extrinsic evidence is not admissible to prove specific

instances of a witness's conduct in order to attack or support the witness's character for truthfulness" counsel may, with the permission of the court, ask about these matters on cross-examination "if they are probative of the character for truthfulness or untruthfulness" of the witness. Fed. R. Evid. 608(b). Although the Court disputes Thomas's characterization of the allegations against Lucero, the acts described in the police report certainly bear on her "character for truthfulness." *See Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. 1994) ("Acts probative of untruthfulness under Rule 608(b) include such acts as forgery, perjury, and fraud."). At this time, the Court is inclined to permit this limited avenue of credibility-related cross-examination, but may revisit this ruling at trial. *See Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007) (stating that a court "should typically defer rulings on relevancy and unfair prejudice objections until trial when the factual context is developed"). Similarly, presuming that Thomas is able to lay an appropriate foundation, the Court would likely accept cross-examination regarding potential bias created by any ongoing criminal investigation into Lucero's conduct. *Cf. Montoya v. Sheldon*, 898 F. Supp. 2d 1259, 1269 (D.N.M. 2012) (noting that "bias is never collateral" and therefore may be proven by extrinsic evidence).

## V.     The Government's Fourth Motion *in Limine* [Doc. 39]

The government's fourth and final pending motion *in limine* centers on its request that the Court admit evidence of Thomas's 1996 robbery at trial pursuant to Federal Rule of Evidence 404(b). Such evidence "is not admissible to prove a person's character in order to show action in conformity therewith," but, "may, however, be admissible for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). The Tenth Circuit has explained that the rule "is one of

inclusion, rather than exclusion, unless the evidence is introduced for the impermissible purpose or is unduly prejudicial." *United States v. Segien*, 114 F.3d 1014, 1022 (10th Cir. 1997). In making this determination, district courts are commended to a four-step analysis, each step of which is mandatory:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011) (citation omitted). Here, the Court's analysis stalls at the first step.

The government contends that its request does not amount to forbidden propensity evidence, arguing that the 1996 robbery is "evidence of motive, intent, plan, identity, or absence of mistake or accident," and, more specifically, that Thomas exhibited the same *modus operandi* in the 1996 robbery as in those charged in this indictment. *See* Doc. 39 at 5-6; Doc. 66 at 4-5. Insofar as is currently apparent from the parties' briefs, this is the only potentially permissible purpose for which the evidence might be admitted in this case. However, the mere fact that the 1996 robbery was committed near the same intersection as the robberies charged in this case is insufficient to constitute a "signature" crime under 404(b). *See, e.g., United States v. Smalls*, 752 F.3d 1227, 1238-39 (10th Cir. 2014) (explaining *modus operandi* analysis and requiring that the "shared quality" must be distinctive). Even so, the Court will reserve its ruling on this question and permit the government to lay a more specific foundation at trial, out of the presence of the jury. Moreover, accepting that this evidence is relevant and connected to a proper purpose would only mean that the Court would then consider the relative weights of the probative and prejudicial effect.

## CONCLUSION

For the reasons discussed above, the Court will **DENY** Defendant's Motion to Suppress Tainted Identifications [Doc. 27], will **GRANT IN PART** the Government's First Motion *in Limine* [Doc. 34], will **DENY** the Government's Second Motion *in Limine* [Doc. 35], and will provisionally **DENY** the Government's Motions *in Limine* as to Character Evidence and Other Acts Evidence [Docs. 38, 39].

Dated this 3rd day of March, 2015.

_____
MARTHA VAZQUEZ
United States District Judge